IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| DANA WRIGHT,                           )<br><br>                           )<br>Plaintiff,              )<br>                           )<br>vs.                        )<br>                           )<br>SLH BETHEL PARK MANAGER, LLC,  )<br>                           )<br>Defendant.             )<br>                           ) | 2:19-cv-01425 |

## **MEMORANDUM OPINION**

Plaintiff Dana Wright ("Wright") alleges that she was terminated from her employment by Defendant SLH Bethel Park Manager, LLC ("SLH") in violation of the Pennsylvania Whistleblower Law, 43 P.S. §§ 1421-28. Wright also asserts a common law claim of wrongful discharge. SLH denies any liability to Wright.

Presently pending is SLH's motion for summary judgment (ECF No. 27). For the reasons that follow, its motion will be granted.[1]

### I.   **Brief Procedural History**

Wright commenced this action in the Court of Common Pleas of Allegheny County on September 25, 2019, naming as Defendant "Senior Lifestyles, Inc." She alleges in Count I that her termination violated the Whistleblower Law and in Count II, she asserts that she was wrongfully discharged.

On November 8, 2019, SLH removed the action to this Court on the basis of diversity jurisdiction. SLH represented that as Wright's employer, it was the proper defendant (ECF No. 1.)

---

[1] The parties have consented to full jurisdiction by a magistrate judge pursuant to 28 U.S.C. § 636(c)(1) (ECF Nos. 10, 11).

The parties' joint motion to change the caption of the case to name SLH as the defendant (ECF No. 15) was granted (ECF No. 17).[2]

Following the completion of discovery, SLH moved for summary judgment (ECF No. 27) and its motion has been fully briefed (ECF Nos. 30, 32, 34).

## II.    Relevant Factual Background

### A.  Wright's Professional Background and Duties With SLH

Wright is a licensed practical nurse (LPN), who is licensed by the Pennsylvania Board of Nursing. She has managed senior living facilities since 1996. She was hired in 2014 to serve as the Executive Director of a senior living facility in Greentree, Pennsylvania ("the South Hills facility") that is owned and operated by SLH, a wholly-owned affiliate of Senior Lifestyle Management Holdings, Inc. ("Senior Lifestyle"). Senior Lifestyle is an operator of senior living communities that provide independent living, assisted living, and memory care housing options for seniors. As Executive Director of the South Hills facility, she was the highest-ranking on-site employee of the facility and was responsible for hiring and managing staff and overseeing the day to day operations of the facility. (Defendant's Concise Statement of Material Facts ("DCSMF") ¶¶ 1, 3-6.)

While working as the Executive Director of the South Hills facility, Wright was responsible for reporting disciplinary issues to state regulatory authorities as required. She was successful in this role and, after working as Executive Director for approximately two years, was promoted to

---

[2] As noted in the Joint Motion to Amend Caption, while working at The Sheridan at Bethel Park, Plaintiff was employed by SLH, which is a wholly owned subsidiary of Senior Lifestyle Management Holdings, LLC. Plaintiff initially named "Senior Lifestyles, Inc." as the party Defendant in this case. As set forth in the joint motion, Senior Lifestyles, Inc. is not affiliated in any way with SLH, Senior Lifestyle Management Holdings, LLC, or The Sheridan at Bethel Park. At the Court's direction, SLH filed an Amended Notice of Removal on April 29, 2021 (ECF No. 37) to properly allege its citizenship as an LLC and confirm that complete diversity exists.

the position of Operations Specialist with Senior Lifestyle. In this position, she was responsible for working with Senior Lifestyle communities to ensure compliance with its policies and expectations. After approximately one year as Operations Specialist, Wright was again promoted, this time to the position of Regional Director of Operations, overseeing all of Senior Lifestyle's facilities in the mid-Atlantic region. (*Id.* ¶¶ 7-9.)

As Regional Director of Operations, Wright was responsible for ensuring that Senior Lifestyle's mid-Atlantic facilities met the company's operational expectations and external regulatory requirements and complied with internal policies and procedures. In that capacity, she was not responsible for reporting disciplinary or operational issues to applicable state regulatory bodies. Rather, the Executive Directors working under her supervision were responsible for complying with state reporting requirements. (*Id.* ¶¶ 10-11.)

In 2018, after working as Regional Director of Operations for approximately two years, Wright decided that she wanted to return to an Executive Director position. She voluntarily sought this change in her role with the company. After she made this decision, she applied for and was hired by SLH as the first Executive Director at The Sheridan at Bethel Park, a newly opened facility located in the South Hills area of Pittsburgh that was run by SLH. Her job responsibilities were substantially similar to her job responsibilities when she served as the Executive Director of the South Hills facility. Specifically, she was responsible for hiring and managing staff and overseeing the day-to-day operations of the facility. (*Id.* ¶¶ 12-13.)

As Executive Director of The Sheridan at Bethel Park, Wright reported to Karin Bateman ("Bateman"), Senior Vice-President of Operations for Senior Lifestyle. Because The Sheridan at Bethel Park was a newly-opened facility, Wright was responsible for hiring almost all of the staff at the facility. Among the staff members she hired was "Jane Doe," a nurse who was hired as the

facility's Director of Health and Wellness. Doe reported directly to Wright. (*Id.* ¶¶ 14-16.)[3]

### B. Wright's Involvement in the Jane Doe Investigation

On June 12, 2019, Senior Lifestyle received a complaint from "John Roe," an employee of The Sheridan at Bethel Park. The complaint stated: "I would like to report the Sheridan at bethel park [sic] for them remaking narc sheets and wasting narcs when the carts are wrong." In response to the complaint, the company initiated an investigation into the allegations made by Roe. The investigation was conducted by Regional Human Relations Director Cathy Ahlert ("Ahlert"), Divisional Director of Health and Wellness Mindy Podraza ("Podraza"), and Bateman. (*Id.* ¶¶ 17-19.)

Shortly thereafter, Wright was informed that an investigation was being undertaken with respect to a complaint that had been received. She was asked to assist in this investigation by obtaining information concerning the allegations had been made by Roe. At the request of Senior Lifestyle, Wright obtained a deceased resident's narcotics records but was not told why she was asked to do so. (*Id.* ¶¶ 20-22.)

Wright asked Doe why she had been asked to provide the records of the deceased resident. After initially saying she did not know, Doe admitted to Wright that she had re-created the narcotics records, destroyed the originals and forged caregivers' signatures on the re-created sheets. Doe's admission was Wright's first notice of wrongdoing. (Plaintiff's Counterstatement of Material Facts Precluding Summary Judgment ("PCMFPSJ") ¶ 21-22.)[4]; see also DCSMF ¶¶ 23-24.)

---

[3] In Defendant's submissions, the individual is referred to as "Jane Doe" and her name is redacted from the materials in the record in order to protect her privacy. The Court will also refer to her as Jane Doe.

[4] ECF No. 33.

According to Wright, Jana Faisant ("Faisant"), the Business Office Manager, was present during a conversation between Wright and Doe and heard Doe admit to re-creating the narcotics sheets and signing the names of other caregivers on these documents. Faisant also was present at conversations with these caregivers who confirmed that they did not sign the re-created narcotics sheets and did not know that Doe had forged their names on them. (PCMFPSJ ¶¶ 58-60.)

While this investigation was pending, Podraza left the company and was replaced by Michelle Tordoff ("Tordoff"), who assumed Podraza's role in the investigation. Wright told Tordoff of her discussion with Doe, and Tordoff relayed the information to the other Senior Lifestyle executives involved in investigating Doe. Additionally, Wright obtained Doe's statement and forwarded it to Tordoff. As part of the investigation, Tordoff and Ahlert interviewed Doe and at Tordoff's request, Wright obtained statements from the employees whose signatures appeared on the re-created narcotics count documents. Tordoff and Ahlert also reviewed the documentation that Wright obtained for them. (DCSMF ¶¶ 25-27.)

Ultimately, it was determined that Doe had impermissibly recreated narcotics count records and did not properly note that they were duplicates or that changes had been made to the original record. The investigation revealed that Doe and her staff had used an incorrect unit of measure (number of syringes rather than the number of milliliters) on the original narcotics sheets and then compounded the problem by recreating them rather than noting the error on the originals.

According to SLH, the investigation did not confirm that Doe forged her subordinates' signatures, and Doe denied doing so when interviewed as part of the investigation.[5] Doe's conduct violated Senior Lifestyle's policy and nursing best practices. (DCSMF ¶¶ 28-31.) Wright asserts

---

[5] Wright attempts to deny these statements, citing a letter she later sent to the company's Human Resources, which is discussed below. She cites no support, however, for denying that Doe did not admit to the forgery when questioned by others.

that Doe's conduct also violated Pennsylvania nursing regulations and personal care facility regulations.

In an email message dated July 19, 2019, Tordoff wrote that she "had a staff statement that the signature on the sheet is not hers" and that the incident "will be reportable to the Board of Nursing in PA due to it being falsification of documentation, but I will wait to do so until the investigation is complete." (PCMFPSJ ¶¶ 31, 75.) At her deposition, Tordoff confirmed the applicability of Standards of Nursing Conduct, 49 Pa. Code § 21.148, and the regulations concerning Personal Care Facilities, 55 Pa. Code §§ 2600.251, 2600.187, as well as the fact that original medical records should never be destroyed. (*Id.* ¶¶ 101-02.)

Despite Wright's report to Ahlert and Tordoff that Doe had admitted to forging signatures on the re-created narcotics documents, Tordoff changed her mind and decided not to report Doe's actions to the State Board of Nursing. (*Id.* ¶¶ 93, 103-04.) Tordoff testified that she did not report Doe's conduct because she could not confirm that Doe had committed a forgery. (Defendant's Response to Plaintiff's Counter-Statement of Material Facts ("DRPCMF") ¶¶ 75, 104.)[6]

Senior Lifestyle suspended Doe without pay, required her to be re-trained on policies and best practices, and gave her a final written warning. The decision to suspend and re-train Doe, rather than terminate her, was made by Tordoff and Ahlert, with Bateman's support. (DCSMF ¶ 32.) Wright contends that the real reason the decision was made not to fire Doe was that because she was pregnant, she was in a protected class. (PCMFPSJ ¶¶ 32, 110.)

Wright was informed of this decision during a conference call with Tordoff, Ahlert, and Faisant on July 25, 2019. During this call, Wright advised Ahlert and Tordoff that she vehemently disagreed with the decision to allow Doe to return to work and believed that Doe should be

---

[6] ECF No. 35.

terminated. The issue of whether to report Doe to the Pennsylvania Board of Nursing was not raised by any of the parties during the phone call. (DCSMF ¶¶ 33-34.) Doe received a Corrective Action Notice on July 29, 2019 (ECF No. 29 Ex. H).

Wright states that she also informed Bateman that the decision to bring Doe back to work despite her wrongdoing was wreaking havoc on the other staff. Bateman told Wright that she understood that Wright was upset, but that the decision had to be made kand they needed to stick with the decision. (PCMFPSJ ¶ 78.)[7]

Wright was upset about this decision for several reasons, including her view that the company's response to Doe's wrongdoing was not justified, that SLH had an obligation to report falsification and destruction of medical records and because she was concerned about the company's license. Faisant confirmed that Wright felt that the company had an obligation to report that medical records were falsified and destroyed. (*Id.* ¶¶ 62-63, 95.)[8] Faisant was also surprised by the decision not to fire Doe because destruction and re-creation of a narcotics sheet is not permitted and was a very serious matter. (*Id.* ¶ 64.)[9]

---

[7] Bateman admitted that she had no way of knowing whether any of the information on the re-created narcotics record was true or false. (PCMFPSJ ¶¶ 73-74.) Wright asserts that Bateman knew that Doe admitted to re-creating narcotics records and destroying the originals because Wright reported Doe's forgery and provided supporting documentation. (*Id.* ¶¶ 61, 71.) According to Wright, Bateman was aware that LPNs are required by Pennsylvania regulations to document and maintain accurate medical records and that if an LPN knowingly falsified medical records, the nurse could be subject to disciplinary action by the Commonwealth. Moreover, The Sheridan at Bethel Park is required by Pennsylvania regulations to keep accurate medical records of medication administration and State regulations require entries in a resident's record to be "signed by the staff making the entry." (*Id.* ¶¶ 68-70.)

[8] Wright also states that Faisant knew that Wright was concerned about her own license, citing Faisant's deposition testimony, but Faisant did not make this statement. *See also id.* ¶ 66.

[9] While Wright states that she and Faisant also discussed the possibility of narcotics diversion (*Id.* ¶ 65), the record contains no evidence that drug diversion occurred. Faisant never raised concerns of drug diversion with the company, and while Wright referred to it as a "possibility" in her August 22, 2019 letter, Doe had already been terminated. (DRPCMF ¶ 65.)

Based on the results of its investigation, SLH did not believe that Doe's conduct constituted a mandatory reporting incident. It further notes that if Wright believed that it was necessary to report Doe's conduct to the Pennsylvania Board of Nursing, she could have done so, both as a licensed nurse and in her role as the Executive Director of the facility. In fact, both Wright and company executives testified that as the Executive Director, she would have been an appropriate person to report any wrongdoing to regulatory authorities. Wright was never directed (expressly or impliedly) that she could not or should not report Doe's conduct. (DCSMF ¶¶ 41-42, 44.)

Wright did not report the matter to the Board of Nursing or any other authority before or after she left the company. See Pl.'s Answer Def.'s First Set of Interrog., Answer No. 5.[10] She notes that she was advised that Tordoff was going to report the matter to the Board of Nursing. (PCMFPSJ ¶ 41.) In addition, she did not believe she had a professional or ethical obligation to report Doe's conduct, and that she satisfied any professional reporting obligation she might have had by "reporting up" to her superiors. (DCSMF ¶ 43.)

Wright did not believe that she was going to be disciplined or face any formal or informal consequences related to her role in the Jane Doe investigation. Her job responsibilities, rate of pay, and job expectations were not changed as a result of her involvement in the Jane Doe investigation, and that she did not expect to face any discipline or criticism related to her role in the investigation. (DCSMF ¶¶ 35-40.)[11]

### C. Wright's Resignation and Subsequent Events

Wright decided to resign from her position on July 25, 2019, the same day that she learned Doe would be allowed to return to work. She resigned because she strongly disagreed with the

---

[10] ECF No. 29 Ex. L.
[11] SLH also claims that Wright testified that she did not feel pressured to resign by Senior Lifestyle. (*Id.* ¶ 38.) However, its cited reference does not support this statement.

disciplinary decision regarding Doe. On July 26, 2019, she sent a resignation letter to Bateman, Senior Vice-President Matt Phillips ("Philips"), and Chief Operating Officer Justin Robins ("Robins") and advised them she was resigning effective August 25, 2019. (DCSMF ¶¶ 35-37.)[12]

Bateman and other Senior Lifestyle executives did not want her to resign and encouraged her not to do so. After receiving Wright's resignation letter on July 26, 2019, Bateman, Wright's direct supervisor, reached out to her to discuss the resignation. During this conversation, Wright told Bateman that she resigned because she felt that the decision to retain Doe reflected that the company did not trust her veracity and was an attack on her integrity. Bateman asked Wright to rescind her resignation and to remain with the company. She did not. (*Id.* ¶¶ 45-46.)[13]

On August 8, 2019, Wright spoke with Robins and Chief Clinical Officer Paula Adams ("Adams") about the situation. During this conversation, both Robins and Adams told Wright that they did not want her to resign. Wright was upset that Doe, who had forged a medical record, was being brought back to work and reported to Robins and Adams that she was very concerned about being required to supervise a nurse who had forged the signatures of other caregivers. (DCSMF ¶¶ 47-48; PCMFPSJ ¶ 89, 97-98.)

Robins spoke with Bateman about Wright's concerns. (PCMFPSJ ¶ 99.)[14] Wright claims that Robins stated his belief that Doe should be fired, but Bateman responded that the decision had

---

[12] Wright states that she told the company she "intended to resign" (PCMFPSJ ¶¶ 96, 106, 109), but her letter unambiguously states that she was resigning. See ECF No. 33 Ex. 1.

[13] Wright contends that she told Bateman that she was going to rescind her resignation, but Bateman decided to accept her resignation as she no longer wanted Wright to remain with the company. (PCMFPSJ ¶¶ 44-46.) As discussed herein, however, it is clear that Wright is referencing a later interaction with Bateman. It is undisputed that shortly after receiving Wright's resignation, Bateman asked her to rescind her resignation and Wright declined to do so.

[14] Wright notes that Adams confirmed that there would have been nothing wrong with Wright going over Bateman's head and notifying Robins that Bateman was retaliating against her for having reported wrongdoing. (*Id.* ¶ 91.) However, there is no record evidence that Wright told Robins that Bateman was retaliating against her.

already been made that Doe would not be fired. (*Id.* ¶ 79.)

The same day as Wright's meeting with Robins and Adams, Bateman traveled to The Sheridan at Bethel Park to encourage Wright to rescind her resignation. During this visit, Wright, Bateman and Vice-President of Sales Anna Wynn ("Wynn") had a lengthy conversation about the Doe investigation and Wright's decision to resign. During this conversation, Bateman repeatedly encouraged Wright to rescind her resignation, advising her that it was her hope that Wright would make The Sheridan at Bethel Park a "flagship community" for Senior Lifestyle. Despite these entreaties, Wright did not rescind her resignation. (DCSMF ¶¶ 47-51.)[15]

Also on this date, Wright advised Bateman of a separate performance incident involving Jane Doe, who left the facility without sufficient support staff. Wright requested and received Bateman's approval to terminate Doe and she was formally terminated on August 15, 2019. (*Id.* ¶ 52.)

According to Wright, on August 15, 2019, after Doe was terminated, Bateman asked Wright a third time to rescind her resignation. Bateman testified that she did not recall communicating with Wright on August 15 and that on August 16, when Wright asked her if she was available to talk, Bateman informed her that she was accepting her resignation:

> I recall saying to her that it was obvious to me, based on the multiple attempts to get her to stay, that she was not interested in staying at the community or I would have gotten an answer a while back; and that I believed it was time for a fresh start for both of us because clearly she was not happy in the fact that we couldn't have a conversation about this community without her crying and getting completely upset; that it was clear to me that this was no longer a place where she enjoyed being either.

---

[15] Wright denies this account of the conversation (PCMFPSJ ¶¶ 49-51), but her citations to the record confirm that she is actually referring to a later conversation, not what occurred on August 8. Moreover, the deposition testimony of Wynn confirms that Bateman attempted to convince Wright to rescind her resignation during this conversation. (ECF No. 29 Ex. J at 13.)

(Bateman Dep. 37:14-38:1.)[16]

Wright recounts the interaction differently. She states that, on August 15, 2019, Bateman asked her for a third time if she would rescind her resignation and they agreed to discuss it further. On August 16, she "reached out to Bateman to discuss recission of her resignation as Bateman had previously requested." (PCMFPSJ ¶ 80.) Bateman said she had decided to accept Wright's resignation and it was "time to hit the reset button." (*Id.* ¶¶ 35, 54-55.) Wright testified as follows:

> Q. So there was a point after you resigned where your understanding was that [Bateman] wanted you to remain employed with Senior Lifestyle, correct?
>
> A. Correct.
>
> Q. Ultimately, [Bateman] changed her mind, right?
>
> A. Yes.
>
> Q. And before you rescinded your resignation, [Bateman] accepted your resignation, correct?
>
> A. Yes.
>
> Q. At the time she accepted your resignation, had you informed her that you were going to rescind your resignation?
>
> A. Yes.
>
> Q. How so?
>
> A. A conversation that the two of us had, and we were going to follow up on that conversation with a more formal, if you will, meeting that we were supposed to have a few days later.

(Wright Dep. 121:7-122:1.)[17]

SLH contends that Wright never advised Bateman that she wanted or intended to rescind her resignation (DCSMF ¶¶ 53-55) and that both Wright and Bateman testified unequivocally that

---

[16] ECF No. 29 Ex. C.
[17] ECF No. 33 Ex. 4.

Wright never asked to rescind her resignation. (DRPCMF ¶ 80.) Wright also acknowledged that she never asked anyone at the company to permit her to rescind her resignation. (Wright Dep. 127.)

On August 22, one business day before Wright's resignation would become effective, Wright sent a two-page letter by email to Alison Kippen ("Kippen"), Senior Lifestyle's Director of Human Resources. (DCSMF ¶ 56.)[18] Although the parties dispute the characterization of this letter (PCMFPSJ ¶ 83; DRPCMF ¶ 83), the letter itself represents the best record evidence of what Wright communicated to Kippen.

In her letter, Wright stated that she disagreed with the decision not to fire Doe, which she believed was not made based on SLH's evaluation of Doe's infractions but because Doe was pregnant and in a protected class. She wrote that:

> When my reports of this wrongdoing were not addressed, and it became clear that I had no choice but to continue to supervise an employee who had admittedly falsified records, particularly narcotic records, violated clear nursing standards and company rules, and that the company was not going to report the wrongdoing or investigate additional potential violations and/or potential controlled substance diversion, I feared that my professional licenses were at risk and that I was being forced to ignore illegal activity by a subordinate. I felt that I was left with no alternative but to resign.

(ECF No. 33 Ex. 2 at 1-2.) Wright reviewed that she submitted her resignation and then "spoke with [Bateman] when she visited the Community and informed her that we had an obligation to report to the state that [Doe] destroyed medical records. [Bateman] did not respond and I got the clear impression that no report was going to be made." (*Id.* at 2.)

With respect to her interaction with Robins, she wrote that:

> On August 8th, [Robins] called me to ask what was going on. I explained the entire situation to him. He walked over to [Adams'] office to discuss in further detail

---

[18] Wright states that Bateman, Ahlert and Tordoff admitted that, prior to this litigation, they never saw this letter and no one had discussed the letter or the accuracy of Wright's assertions with them. (PCMFPSJ ¶¶ 76, 94, 105.) She has not explained why this is relevant to the resolution of any issue in this case.

between the three of us on speaker phone. [Adams] was under the assumption that [Doe] had been fired as [Adams] had given the order for [Doe] to be terminated. [Robins] said he would discuss details further with [Bateman] prior to her arrival at my Community later that day.

(*Id.*) Robins confirmed the accuracy of this report. (PCMFPSJ ¶ 100.)

Wright concluded her letter as follows:

[Doe] was terminated on August 15, 2019. That afternoon, [Bateman] sent me a text asking if I would consider staying and that she would call me later to discuss. When I didn't hear from her at the agreed upon time of 3:00 p.m., I made multiple attempts to contact [Bateman], with no response. On August 16, 2019, I asked [Bateman] again if she was available to talk. She replied with a call and informed me that she decided she was accepting my resignation and she no longer wanted me to stay with the Company. [Bateman] told me it was "time for her to press the reset button."

I have a Personal Care Home License and a Nursing License; licenses that I have worked hard to obtain. I will not risk losing my licenses. Since the Company has refused to report that medical records were recreated, destroyed and forged, I believe that I have a professional obligation to report this wrongdoing to the Commonwealth of Pennsylvania.

The decision to resign has been very difficult for me but a necessary one due to the evens described above. Had the company made the correct and lawful decisions following the investigation and [Doe's] termination, I would have stayed. However, [Bateman] has made it clear that I am no longer welcome. I never envisioned myself leaving this company before retirement. This is a company I have worn many hats for and continue to commit my final days of employment as a dedicated employee.

(ECF No. 33 Ex. 2 at 2.)[19]

Wright claims that because that SLH's policies prohibit retribution and retaliation against

---

[19] Wright represents that she "intended to stay employed and was not going to resign on August 25, 2019, until Bateman told Wright she had no choice to stay employed with the company." She also states that she feared for her professional license if she was forced to ignore illegal activity by a subordinate. (PCMFPSJ ¶¶ 108-09.) SLH disputes these statements. (DRPCMF ¶¶ 108-09.) Notably, Wright's representations contradict her letter of July 26 (which stated that she was resigning, not that she intended to resign) and her August 22 letter did not state that she intended to rescind her resignation prior to the time Bateman accepted it. Moreover, as explained in the text, Wright did not express concerns about her license to anyone prior to August 22, 2019 and she admitted at her deposition that she had no basis for these fears.

whistleblowers who report wrongdoing, it was Kippen's responsibility to ensure that employees who report wrongdoing are protected from any adverse employment actions against them. Nonetheless, Wright asserts, Kippen did nothing in response to her letter. (PCMFPSJ ¶¶ 84-85.) Kippen acknowledged that it would be wrong for a supervisor to retaliate against an employee who reported wrongdoing. (PCMFPSJ ¶ 88.) According to SLH, however, Wright did not report wrongdoing. (DRPCMF ¶¶ 84-85.) Kippen simply agreed that Wright used the term "wrongdoing" in her letter, not that she agreed with Wright's complaints. (DRPCMF ¶ 86.) Rather, SLH contends, Wright did not make a whistleblower complaint, assert that she was being retaliated against or cite to any evidence to support a retaliation claim. (DRPCMF ¶ 88.) While Wright claims that Kippen testified that Ahlert was investigating Wright's whistleblower claim (PCMFPSJ ¶ 87), SLH asserts that Kippen actually testified that Ahlert investigated the allegations concerning Jane Doe (DRPCMF ¶ 87).

Wright's resignation became effective on August 25, 2019. Her lawsuit followed.

## III.    Standard of Review

The Federal Rules of Civil Procedure provide that: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Summary judgment may be granted against a party who fails to adduce facts sufficient to establish the existence of any element essential to that party's case, and for which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The moving party bears the initial burden of identifying evidence which demonstrates the absence of a genuine issue of material fact. Once that burden has been met, the non-moving party must set forth "specific facts showing that there is a genuine issue for trial" or the factual record

will be taken as presented by the moving party and judgment will be entered as a matter of law. *Matsushita Elec. Indus. Corp. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). An issue is genuine only if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The Court of Appeals has held that "where the movant bears the burden of proof at trial and the motion does not establish the absence of a genuine factual issue, the district court should deny summary judgment even if no opposing evidentiary matter is presented." *National State Bank v. Federal Reserve Bank*, 979 F.2d 1579, 1582 (3d Cir. 1992).

In following this directive, a court must take the facts in the light most favorable to the non-moving party, and must draw all reasonable inferences and resolve all doubts in that party's favor. *Hugh v. Butler County Family YMCA*, 418 F.3d 265, 266 (3d Cir. 2005); *Doe v. County of Centre, Pa.*, 242 F.3d 437, 446 (3d Cir. 2001).

## IV.   Discussion

### A.   Whistleblower Claim

In Count I of the Complaint, Wright alleges that her termination violated the Whistleblower Law. The Whistleblower Law provides a remedy for wrongful discharge, discrimination or retaliation when it is undertaken with a specific, unlawful intent. 43 P.S. §§ 1423-24.[20] It precludes an employer from, among other things, discharging an employee in retaliation for the employee's act of making a good faith report, verbally or in writing, to the employer or an appropriate authority of an instance of wrongdoing by a public body or another employee, or when the employee is requested by an appropriate authority to participate in an investigation by an appropriate authority.

---

[20] At the same time, it does not convey a property right in continued employment. *See, e.g., Conrad v. Northumberland Cty.,* 2010 WL 454960, at *6 (M.D. Pa. Feb. 3, 2010).

43 P.S. § 1423. "Wrongdoing" is defined in the statute as more than a mere technical or minimal violation of federal or state laws or regulations. 43 P.S. § 1422.

> As summarized by the Pennsylvania Supreme Court:
>
> The Whistleblower Law expressly prohibits an employer from retaliating against an employee because of that employee's report of wrongdoing or waste by the employer, and an employee alleging a violation may bring a civil action for injunctive relief, or damages, or both. § 1423(a). An employee alleging a violation of the Whistleblower Law must show, by a preponderance of the evidence, that prior to the adverse employment action, the employee reported in good faith, verbally or in writing, an instance of wrongdoing or waste to the employer or an appropriate authority. § 1424(b). An employer may defend such an action by showing, by a preponderance of the evidence, its action against the employee "occurred for separate and legitimate reasons, which are not merely pretextual." § 1424(c).

*Bailets v. Pennsylvania Tpk. Comm'n*, 123 A.3d 300, 307-08 (Pa. 2015).

SLH argues that Wright has not and cannot prove any of these elements. First, it claims, she did not "report wrongdoing" but simply participated in an ongoing investigation at the request of her employer and then disagreed with the outcome. Second, she did not suffer an adverse employment action; instead, she voluntarily resigned because she disagreed with her employer's decision not to terminate another employee for misconduct. Finally, it contends that Wright cannot identify a causal connection between her participation in the investigation and her voluntary resignation.

### 1.  Report of Wrongdoing

It is undisputed that SLH received a complaint that led to an investigation into Doe's actions in which Wright participated. The parties vigorously debate whether Wright reported "wrongdoing." SLH essentially contends that Wright merely confirmed allegations of which it was already aware. *See U.S. ex rel. Hartman v. Allegheny Gen. Hosp.*, 2005 WL 2106627, at *5 (W.D. Pa. Aug. 26, 2005) (billing clerk who had no personal knowledge of any improper billings could

16

not state a Whistleblower Law claim because her supervisors were already aware of, and addressing, the billing problem). It also argues that recopying narcotics documents constitutes the type of *de minimis* conduct that is not protected by the law.

Wright argues that she obtained Doe's admission that she had forged documents—a fact not previously known by SLH—and that although she reported this fact to SLH, it refused to act on it. She contends that, as SLH admitted, Doe's act of forging signatures is more than *de minimis* conduct as it violated the nursing standards set forth in 49 Pa. Code § 21.148(a) and (b) as well as the regulations concerning personal care home medical records set forth in 55 Pa. Code § 2600.187 and § 2600.251. Thus, according to Wright, Doe's actions constituted "wrongdoing" for purposes of the Whistleblower Law.[21]

SLH has not addressed the fact that Wright reported Doe's admission about forging employees' signatures other than to state that its investigation was unable to corroborate the forgery. However, it has not supported its implication that an employee's report of wrongdoing ultimately must be proven in order to state a claim under the Whistleblower Law. On the contrary, the statute defines a "good faith report" of wrongdoing as: "A report of conduct defined in this act as wrongdoing … which is made without malice or consideration of personal benefit and which the person making the report has reasonable cause to believe is true." 43 P.S. § 1422. The statute protects employees who indicate that they are "about to report" a good-faith belief that wrongdoing has occurred, and does not limit its scope to situations in which employers ultimately confirm the

---

[21] In its reply brief, SLH states that the Board of Nursing requires licensees such as Wright to report substantial evidence of substance abuse or drug diversion, potential child abuse, knowledge that another nurse has been charged with or convicted of a crime and abuse of a resident of a long-term care facility, none of which occurred in this case. (ECF No. 34 at 2 n.1.) However, it has not cited any authority that limits mandatory reporting to these four scenarios and the Court has been unable to find one in its own research.

veracity of the report. 43 P.S. § 1423(a). Moreover, case law involving similar statutes does not suggest that conclusive proof of a report of wrongdoing must be established. *See Daniels v. School Dist. of Phila.*, 776 F.3d 181, 193 (3d Cir. 2015) (a plaintiff in a retaliation case need not prove the merits of the underlying discrimination complaint, just that she acted under a good faith, reasonable belief that a violation existed).

Thus, the Court concludes that Wright's notification to her supervisors that Doe admitted to forging documents constitutes a report of wrongdoing for purposes of the Whistleblower Law.[22]

In her brief, Wright presents an additional theory: that her August 22, 2019 letter to Kippen constituted her "report of wrongdoing," but Kippen "did nothing in response" and allowed Wright's employment to end. This theory suffers from two fatal flaws.

First, Wright has not explained the nature of the "wrongdoing" that her letter supposedly reported. While her letter reports Doe's wrongdoing, Wright had already reported this information to Bateman, Ahlert, Tordoff, Robins and Adams, and Doe had already been reprimanded for the events that Wright investigated. While her letter could also be interpreted as a report about Senior Lifestyle's decision not to fire Doe for the first offense, Wright cites no authority for the proposition that this constituted "wrongdoing." SLH took action by suspending Doe without pay, requiring her to be retrained on policies and best practices and giving her a final written warning. Wright fails to demonstrate that, while she may have disagreed with SLH's decision not to fire Doe, it represented wrongdoing.

To the extent that her letter can be construed a report that SLH failed to notify the Board of Nursing about Doe's forgery, Wright has not explained how it constituted a report of

---

[22] The Court need not resolve the issue of whether the company willfully ignored Doe's forgery in order to relieve itself of the obligation of reporting it to the Board of Nursing as Wright contends.

wrongdoing when, by Wright's admission, it was her own responsibility to report nursing infractions as the Executive Director of the facility. She contends that Tordoff had misled her to believe that she would report the matter and then changed her mind, but that does not address why Wright could not have done so at any time. In addition, no one instructed her not to report the matter.

Finally, Wright's letter theoretically could be construed as notice to the company that she was "about to report" an instance of wrongdoing under the Whistleblower Law, namely that she was about to notify the state Board of Nursing about the company's failure to report Doe's actions. However, her letter does not threaten to make this report and she never made any report.

The other problem with Wright's theory is that her employment ended because she voluntarily resigned, an action she took *before* sending her letter. *See Bailets*, 123 A.3d at 308 (report of wrongdoing must occur before adverse employment action). *See also Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 279 (3d Cir. 2000) (plaintiff must demonstrate that "the employer took an adverse employment action after or contemporaneous with the employee's protected activity"); *Warfield v. SEPTA*, 460 F. App'x 127, 132 (3d Cir. 2012) ("Knowledge of an employee's protected conduct is an essential element of establishing a causal connection.") Thus, she cannot make a causal connection between her voluntary resignation on July 26 and her report on August 22.

## 2. Adverse Employment Action

SLH argues that because Wright voluntarily resigned, she was not subjected to an adverse employment action. Wright contends that the conditions at the company effectively required her to resign and/or that SLH subjected her to an adverse employment action when it refused to allow her to rescind her resignation.

"Voluntary resignation is not an adverse employment action." *Larochelle v. Wilmac Corp.*, 769 F. App'x 57, 60 (3d Cir. 2019). The only scenario in which a resignation can constitute an adverse employment action is if it rises to the level of a "constructive discharge." *Id.* (citation omitted). The Supreme Court has described constructive discharge as "an employee's reasonable decision to resign because of unendurable working conditions…The inquiry is objective: Did working conditions become so intolerable that a reasonable person in the employee's position would have felt compelled to resign?" *Pennsylvania State Police v. Suders*, 542 U.S. 129, 141 (2004) (citations omitted). The Court further observed that, as compared to a pure hostile work environment claim, "[a] hostile environment constructive discharge claim entails something more: A plaintiff who advances such a compound claim must show working conditions so intolerable that a reasonable person would have felt compelled to resign." *Id.* at 147 (citations omitted).

The Court of Appeals has recognized the following factors to consider in evaluating whether the employer permitted conditions so unpleasant or difficult that a reasonable person would have felt compelled to resign: whether the employer (1) threatened the employee with discharge or urged or suggested that she resign or retire, (2) demoted her, (3) reduced her pay or benefits, (4) involuntarily transferred her to a less desirable position, (5) altered her job responsibilities, or (6) gave unsatisfactory job evaluations. *See Colwell v. Rite Aid Corp.*, 602 F.3d 495, 502-03 (3d Cir. 2010); *Clowes v. Allegheny Valley Hosp.*, 991 F.2d 1159, 1161 (3d Cir. 1993).

In this case, it is undisputed that none of these factors apply. Wright was not demoted, her pay and benefits were not reduced, she was not involuntarily transferred to a less desirable position, her job responsibilities were not altered and she did not receive an unsatisfactory evaluation. It is undisputed that after Wright voluntarily resigned, multiple SLH employees encouraged her to stay, including Bateman.

Wright makes two arguments in support of a constructive discharge claim; that she feared SLH's refusal to report Doe's wrongdoing put her own professional licenses in jeopardy, and that SLH wrongfully refused to allow her to rescind her resignation. Both arguments are unavailing, as discussed below.

a.   Wright's Fear That Her Licenses Were in Jeopardy

Wright claims that she feared her professional licenses were in jeopardy, but her own testimony refutes this argument. She admits that she resigned when she learned of the decision to allow Doe to return to work, not because of any reporting concerns. In fact, on the date she learned that Doe would not be terminated, she had no reason to believe that Doe's conduct would not be reported.[23] It would have been Wright's responsibility—if anyone's—to report Doe's wrongdoing because she was the Executive Director of the facility, but Wright testified that she satisfied any obligation she had by reporting the issue up the chain of command. If, in fact, she had been concerned about her licenses, she could have reported Doe at any time. Simply put, the record evidence fails to support an allegation that she feared that her licenses were in jeopardy.

In support of her position, Wright cites *Dieckmann v. Care Connection of Cincinnati, LLC*, 2018 WL 6675491, at *6 (S.D. Ohio Dec. 19, 2018). In that case, the plaintiff resigned and offered evidence on which a jury could find that she reasonably believed the employer was asking her to engage in fraud because she knew that the employer and a third party were the subject of a federal investigation. The court held that: "Under these circumstances, a jury could reasonably find that [Plaintiff]—like the nurse plaintiff in *Smith v. LHC Group, Inc.*, 727 F. App'x 100 (6th Cir. 2018)—had no choice but to resign or to subject herself to possible prosecution and loss of her

---

[23] According to Wright's August 22 letter, it was not until August 8, when she met with Bateman in person, that she "got the clear impression that no report was going to be made."

nursing license and reputation. Thus, the Court concludes that [Plaintiff] has raised a genuine issue of material fact that [Defendant] constructively discharged her." *Id.*

In the *Smith* case, the Court of Appeals for the Sixth Circuit concluded: "A jury may conclude that it is damaging to a professional to require her to engage in activity she considers illegal and immoral with the threat of prosecution and loss of her nursing license looming in the background." 727 F. App'x at 104. However, the court then distinguished the situation from one presented in another case, stating that:

> The defendants analogize Smith's case to *U.S. ex rel. Absher v. Momence Meadows Nursing Ctr., Inc.*, 764 F.3d 699, 716 (7th Cir. 2014), in which the Seventh Circuit decided in favor of a healthcare facility which had been sued for retaliation on a theory of constructive discharge. In that case, a nurse's supervisors responded with hostility when she complained about substandard, unhygienic conditions at the facility. *Id.* The nurse quit, believing that the conditions had led to a patient's death. *Id.* The Seventh Circuit found that no constructive discharge occurred because, despite the regulatory violations, the facility had done nothing to make the plaintiff's employment sufficiently unbearable to constitute a constructive discharge. *Id.* We find that *Absher* is distinguishable from Smith's case. The nurse in *Absher* was not required to provide substandard care or otherwise entangled in her coworkers' failure to provide proper healthcare. Smith, in contrast, pleads that her administrative role required her to supervise and implement patient orders and complete paperwork necessary to secure Medicaid and Medicare funding. Smith's knowledge of her coworker's scheme to improperly change patient orders prior to clinical evaluation could have exposed her to investigation and prosecution. The jury may conclude that if the employee is left to worry about whether she will be charged with fraud by the government if she remains on the job, her employer's fraudulent behavior is imposing on her a state of mind that would cause a reasonable employee to resign. Whether a constructive discharge occurred "depends upon the facts of each case."

*Id.*

Wright's situation resembles that of the plaintiff in *Absher*, not the plaintiff in *Smith*. Wright was not required to provide substandard care and was not otherwise entangled in Doe's

failures.[24] By her own testimony, she did not have to worry about being charged with wrongdoing if she remained in her position. She concluded that she satisfied any ethical obligations she had by reporting Doe's wrongdoing to her supervisors. Since she herself concluded that she had no objective basis for believing that her licenses were in jeopardy, she cannot use SLH's failure to report Doe as a basis for constructive discharge. In short, there is no evidence that she feared that her licenses were in jeopardy, and therefore, had no choice but to resign when Doe was retained. Indeed, she never raised concerns about her licenses until she submitted her August 22 letter, by which time Doe had been terminated.

b.  Rescission of Resignation

Wright contends that SLH refused to allow her to rescind her resignation, while SLH argues that it is undisputed that she never asked to rescind her resignation. Further, SLH asserts, it would have been under no obligation to grant such a request even if she had done so.

Despite Wright's arguments in her brief, the only reference in the record that could possibly support her claim that she ever asked to rescind her resignation is her testimony that on August 15, Bateman asked her for a third time if she would rescind her resignation and Wright said that they should discuss the issue further. When Wright reached out to Bateman the next day, Bateman had already accepted her resignation.

Notably, Wright's August 22 letter does not state that she notified Bateman that she intended to rescind her resignation, much less that she was actually doing so.[25] On the contrary,

---

[24] Wright does not argue that Senior Lifestyle precluded her from acting if Doe committed further wrongdoing. In fact, as explained in the text, based upon subsequent wrongdoing and based upon Wright's recommendation, Doe was terminated.

[25] In her brief, Wright makes the unusual argument that, although Bateman initially asked her to rescind her resignation, she was "displeased" that Wright had gone over her head to Robins and then "retaliated" against her by accepting her resignation (ECF No. 32 at 7). Left unexplained in this scenario is the fact that Wright claims that Bateman asked Wright to rescind her resignation a

Wright's August 22 letter explicitly states that even after Doe was terminated, she continued to believe that she could not continue to work for SLH because it had refused to report Doe's conduct to the Board of Nursing. Moreover, she testified unequivocally that she was *not* asking Kippen to rescind her resignation and indeed, never asked anyone at the company to allow her to rescind her resignation. (Wright Dep. 127-28.)[26]

Even if Wright could support her claim that she sought to rescind her resignation, numerous courts have held that failure to accept an employee's rescission of a voluntary resignation is not, on its own, an adverse employment action "for the simple reason that the employment relationship has ended." *Hibbard v. Penn-Trafford Sch. Dist.*, 2014 WL 640253, at *10 (W.D. Pa. Feb. 19, 2014) (citing *Schofield v. Metro. Life Ins. Co.*, 2006 WL 2660704 (M.D. Pa. Sept. 15, 2006), *aff'd mem.*, 252 F. App'x 500 (3d Cir. 2007)). *See also Henderson v. Mercy Cath. Med. Ctr.*, 2018 WL 3344655, at *6 (E.D. Pa. July 9, 2018); *Jones v. McCormick & Schmick's Seafood Restaurants, Inc.*, 2014 WL 1669808, at *5 (D.N.J. Apr. 28, 2014); *Cadet v. Deutsche Bank Sec. Inc.*, 2013 WL 3090690, at *13 (S.D.N.Y. June 18, 2013) (noting that employers are not obligated to allow employees who have resigned to rescind their resignations in an at-will employment state).

---

third time on August 15, 2019, one week after Wright spoke to Robins. Moreover, as explained in the text, an employee's voluntary resignation does not constitute an adverse employment action and therefore, an employer's act of "accepting" an employee's voluntary resignation cannot constitute an adverse employment action. Indeed, "[a]n employer's decision to accept a resignation immediately, rather than accepting an employee's request that the resignation be effective at a future date, does not constitute an adverse employment action." *Leyva v. Computer Sci. Corp.*, 2005 WL 196557, at *5 (D. Del. Jan. 25, 2005) (citation omitted), *aff'd on other grounds*, 169 F. App'x 720 (3d Cir. 2006).

[26] Wright cites a portion of Bateman's deposition in which she testified that, if Wright had asked to rescind her resignation when Bateman accepted it on August 16, Bateman likely would not have accepted the rescission (PCMFPSJ ¶ 81). She then argues in her brief that this demonstrates that her employment "clearly did not end voluntarily." (ECF No. 32 at 12-13.) But Wright did not ask to rescind her resignation on that date or any other date, nor can SLH's liability be based upon an answer to a hypothetical question.

While Wright cites *Hibbard* and *Checa v. Drexel University*, 2016 WL 3548517 (E.D. Pa. June 28, 2016), in support of her position, *Hibbard* rejected this argument and the *Checa* court expressly stated that: "Our Court of Appeals has not recognized voluntary resignations to be adverse employment actions. Courts in this circuit specifically decline to recognize the refusal to allow an employee to rescind his resignation to be an adverse employment action, without a contractual or statutory duty to do so, or without a finding of a constructive discharge." *Id.* at *5 (citing *Schofield*, 252 F. App'x at 503).

Wright has not pointed to the existence of an adverse employment action. Rather, the evidence of record demonstrates that she voluntarily resigned her employment on July 26, 2019 because she disagreed with SLH's decision not to fire Doe, that she never asked to rescind this resignation and that Senior Lifestyle would have been under no obligation to accept her rescission even if she had submitted such a request.

### 3. Causal Relationship

The Pennsylvania Supreme Court has stated that "to make out a prima facie case of retaliatory termination pursuant to the Whistleblower Law, a plaintiff must 'show by concrete facts or surrounding circumstances that the report [of wrongdoing or waste] led to [the plaintiff's] dismissal, such as that there was specific direction or information received not to file the report or [that] there would be adverse consequences because the report was filed.'" *Golaschevsky v. Com., Dep't of Env''t Prot.*, 720 A.2d 757, 759 (Pa. 1998) (quoting *Gray v. Hafer*, 651 A.2d 221, 225 (Pa. Commw. 1994), *aff'd mem.*, 669 A.2d 335 (Pa. 1995)). In *Golaschevsky*, the court held that the plaintiff failed to establish causation based on his subjective belief that after his report, his supervisor became angry with him and his co-workers treated him differently, and he received a negative performace review that was unconnected to his report.

Wright similarly fails to establish causation. She does not offer evidence of any adverse consequences; rather, she only offers her subjective belief that she could not continue to work for a company that would fail to report Doe's actions to the Board of Nursing. Wright was repeatedly asked to rescind her resignation but declined to do so. As the record reflects, while she claims otherwise, she resigned because of her disagreement with the results of the investigation.[27] When asked during her deposition the following question: "that decision to bring [Doe] back is why you resigned, correct?" she responded:  "Correct." (Wright Dep. 108:25-109:2.)

In short, while Wright's report of Doe's forgery was a report of wrongdoing, she has not demonstrated that she suffered an adverse employment action or that her report was causally related to a termination of her employment. Moreover, she cannot base a constructive discharge claim on an allegation that SLH refused to allow her to rescind her resignation. Not only is this allegation unsupported by the record but as a matter of law, but SLH was not obligated to allow her to do so. Therefore, with respect to Count I of the Complaint, SLH is entitled to judgment in its favor.

### B.  Wrongful Discharge

Wright also alleges that she was wrongfully terminated in violation of public policy. SLH contents that because her wrongful discharge claim is predicated solely upon SLH's alleged violation of the Whistleblower Law, the claim fails for the same reasons. (ECF No. 27 at 2 n.1; ECF No. 30 at 9.) Wright does not suggest any different analysis with respect to the wrongful discharge claim. Thus, SLH is entitled to judgment as a matter of law with respect to the wrongful discharge claim for the same reasons outlined with respect to the Whistleblower Law claim.

---

[27] Because Wright has not satisfied "the threshold showing of a causal connection," the burden does not shift to SLH to show a separate and legitimate reason for its actions. *See Evans v. Thomas Jefferson Univ.*, 81 A.3d 1062, 1070 (Pa. Commw. 2013) (citation omitted).

Wright's claim also fails for a second reason. The Pennsylvania Supreme Court has affirmed that: "Generally, an employer "may discharge an employee with or without cause, at pleasure, unless restrained by some contract. Absent a statutory or contractual provision to the contrary, the law has taken for granted the power of either party to terminate an employment relationship for any or no reason. The employer's privilege to dismiss an employee with or without cause is not absolute however, and may be qualified by the dictates of public policy. *Shick v. Shirey*, 716 A.2d 1231, 1232 (Pa. 1998) (quoting *Geary v. U.S. Steel Corp.*, 319 A.2d 174, 176 (Pa. 1974)) (at will employee who alleges retaliatory discharge for the filing of a workers' compensation claim has stated a cause of action). Pennsylvania courts have also recognized a public policy exception for employees who were fired for filing unemployment compensation claims, *Highhouse v. Avery Transp.*, 660 A.2d 1374, 1378 (Pa. Super. 1995); refused to take a polygraph test, *Kroen v. Bedway Sec. Agency,* 633 A.2d 628, 633 (Pa. Super. 1993); refused to commit a crime, *Mikhail v. Pennsylvania Org. for Women in Early Recovery*, 63 A.3d 313, 319 (Pa. Super. 2013); and participated in jury duty, *Reuther v. Fowler & Williams, Inc.*, 386 A.2d 119, 120 (Pa. Super. 1978).

However, the Third Circuit Court of Appeals has held that under Pennsylvania law, an action for wrongful discharge may only be asserted if there is no available statutory remedy for the aggrieved employee. *See Novosel v. Nationwide Ins. Co.*, 721 F.2d 894, 899 (3d Cir. 1983). Courts have specifically applied this rule to bar common law claims where a plaintiff had a cognizable claim under the Whistleblower Law. *See Angelini v. U.S. Facilities, Inc.*, 2018 WL 3155995, at *12 (E.D. Pa. June 27, 2018); *Kent v. Keystone Human Servs.*, 68 F. Supp. 3d 565, 568 (M.D. Pa. 2014); *Katzenmoyer v. City of Reading, Pa.*, 158 F. Supp. 2d 491, 503 (E.D. Pa. 2001); *Freeman v. McKellar*, 795 F. Supp. 733, 742 (E.D. Pa. 1992).

In this case, Wright has asserted a claim under the Whistleblower Law. Even though this claim is without merit, she cannot pursue a separate wrongful discharge against SLH based upon the same circumstances: "Whether or not [plaintiff's] claim can succeed is irrelevant; "[i]t is the existence of the remedy, not the success of the statutory claim, which determines preemption." *Preobrazhenskaya v. Mercy Hall Infirmary*, 71 F. App'x 936, 941 (3d Cir. 2003) (citation omitted). Therefore, with respect to Count II of the Complaint, SLH is also entitled to judgment in its favor as a matter of law.

### c.  Conclusion

For these reasons, SLH's Motion for Summary Judgment will be granted. An appropriate order will follow.

Dated: May 20, 2021                          BY THE COURT:


                                             /s/Patricia L. Dodge
                                             PATRICIA L. DODGE
                                             United States Magistrate Judge